UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KENNETH PHIPPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:10-cv-00412-DBH |
| | ) |
| KEVIN CRAMP, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (DOC. NO. 13)**

Kenneth Phipps has sued eight separate Lewiston police officers in connection with two separate incidents in Lewiston, Maine, occurring on May 19, 2008, and May 2, 2010, alleging that the police officers conspired to violate his civil rights by the manner in which they handled investigations connected with each of these incidents. The gravamen of Phipps's complaint is that he is "a black man amongst white accusers and perpetrators, and they conspired to bar him access to the court for proper redress against such perpetrators by withholding evidence and failing in their statutory obligations to commence suits for civil or criminal violations according to the State of Maine statutes." (Compl. ¶ 1, Doc. No. 1.) Phipps perceives himself to have been the victim of two separate criminal events and he believes the Lewiston police officers who responded to and investigated those events were nonresponsive to his concerns. He views their actions as stemming from racial animus directed toward him. The defendants have moved for summary judgment and Phipps has not responded to their motion. I now recommend that the court grant the motion and enter judgment in favor of the defendants.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> > **(A)** citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information, affidavits or
> > declarations, stipulations (including those made for purposes of the motion
> > only), admissions, interrogatory answers, or other materials; or
> > **(B)** showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot produce
> > admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). I draw all reasonable inferences in favor of Phipps, but where he bears

the burden of proof, he "'must present definite, competent evidence' from which a reasonable

jury could find in [his] favor." United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d

8, 17 (1st Cir. 2007) (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st

Cir. 1992)).

> Phipps has not presented any evidence in defense of the motion for summary judgment.

However, this court,

> may not automatically grant a motion for summary judgment simply because the
> opposing party failed to comply with a local rule requiring a response within a certain
> number of days. Rather, the court must determine whether summary judgment is
> "appropriate," which means that it must assure itself that the moving party's submission
> shows that "there is no genuine issue as to any material fact and that the moving party is
> entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Advisory
> Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does
> not establish the absence of a genuine issue, summary judgment must be denied even if
> no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002).

District of Maine Local Rule 56 (f) provides that facts contained in a statement of material facts, if supported by record citations, are deemed admitted unless properly controverted. None of the material facts submitted by the defendants have been controverted by Phipps, either in opposition to the summary judgment motion or in the submissions attached to the initial complaint, which is notarized, but not submitted under oath or penalty of perjury.

## Undisputed Material Facts

Brian O'Malley, Eric Syphers, and Kevin Cramp were employed as police officers by the City of Lewiston during the time period referenced in Phipps's complaint. All three officers are graduates of the Maine Criminal Justice Academy and, at all times relevant to the above-referenced matter, were certified to perform the duties of law enforcement officers by the State of Maine.

### *The May 19, 2008, Incident – O'Malley, Syphers, Theiss, St. Laurent, Philippon[1], Somma[2]*

On May 19, 2008, the Lewiston Police Department received two phone calls regarding a shooting that occurred at 17 Horton Street in Lewiston. Roland Roy called 911 from 34 Bartlett Street to report that his brother-in-law, James Dehart, had been shot. The second call received by the Lewiston Police Department was from Kenneth Phipps who advised that he had just shot a person at 17 Horton Street. Lewiston police officers were dispatched to both 34 Bartlett Street and 17 Horton Street.

Officer Syphers was dispatched along with other officers to 34 Bartlett Street regarding a male at that location who had been shot. While en route, Officer Syphers was advised by dispatch that the suspected shooter, a black male, was standing in front of 17 Horton Street.

---

[1]     Plaintiff spells Joseph Philippon with two "l's," but all of the pleadings submitted by the defendants have used only one and so I have adopted the defendants' spelling in this recommended decision.

[2]     Michael Bussiere, although identified as the Chief of Police for the Lewiston Police Department, does not appear in connection with either incident and apparently is sued in a supervisory capacity.

Officer Syphers and Sgt. Randy St. Laurent responded to 17 Horton Street and observed a male, subsequently identified as Kenneth Phipps, at that location. Because the officers understood that Mr. Phipps had just shot someone and they were unaware as to whether he was armed and presented a danger to them, Officer Syphers covered Sgt. St. Laurent with his drawn weapon as Sgt. St. Laurent approached Mr. Phipps. Officer Syphers observed as Sgt. St. Laurent placed handcuffs on Mr. Phipps and did a brief pat down for weapons on his person, which were not found. Once Mr. Phipps was secured, Officer Syphers and Officer Philippon stayed with Mr. Phipps while Sgt. St. Laurent went to 34 Bartlett Street to speak to the shooting victim. After a brief discussion, Mr. Phipps identified himself to Officer Syphers. As Officer Syphers looked around the area for the weapon used in the shooting, Mr. Phipps advised him that it was on a table inside the residence and that there were other things out in the rear of the residence that Officer Syphers would want to see.

Officer Syphers looked through the window of the residence and saw a small wooden-handled handgun sitting on a white table. After Officer Syphers observed the handgun, he walked toward the rear of the building and located a medium-sized black folding knife on the ground. Near the knife was a can of what appeared to be an energy drink. Mr. Phipps stated that both items were in the hands of the shooting victim when he was shot. A short time later, Officer Syphers was directed by a supervisor to have Mr. Phipps transported to the Lewiston police station. Mr. Phipps was transported to the Lewiston Police Station by Officer Jeremy Somma for an interview.

James Dehart, a white male, was located in the driveway of 34 Bartlett Street, and was transported to Central Maine Medical Center for treatment of a gunshot wound to the back of his left hip. Officer O'Malley spoke briefly with Mr. Phipps at the Lewiston police station. Mr.

Phipps described the incident by saying "a guy pulled a knife at a gun fight and I shot him." Mr. Phipps advised that he had a surveillance camera on the side of his apartment building and that it likely captured the confrontation in the parking lot. Mr. Phipps refused to provide the surveillance tape voluntarily. Officer O'Malley eventually was able to get a copy of the surveillance tape with a search warrant.

Officer O'Malley went to Central Maine Medical Center to speak to the shooting victim, James Dehart. Mr. Dehart advised Officer O'Malley that he and Roland Roy were walking home after going to a store and took a shortcut through the parking lot of an apartment building on Horton Street. Mr. Dehart reported that, as they were taking the shortcut, someone yelled at them to quit walking through the yard. Mr. Dehart admitted that he yelled an obscenity in response. Mr. Dehart stated that a man then ran down the stairs of the building at 17 Horton Street and charged at him. Mr. Dehart said that this man then pointed a gun at him. Mr. Dehart claimed that, at that point, he reached into his pocket to get his cell phone to call police and the man shot him. Mr. Dehart advised Officer O'Malley that he then ran away from the scene and over to 34 Bartlett Street, where he was found by police officers. Because Officer O'Malley had been advised by the officers who responded to 17 Horton Street that they found a knife on the ground at the scene of the shooting, he asked Mr. Dehart about it, but Mr. Dehart denied having a knife with him at the time he was shot.

Officer O'Malley and Detective James Theiss then met with Roland Roy at 34 Bartlett Street. Mr. Roy confirmed Mr. Dehart's statement about the two of them going to a store and taking a shortcut through the parking lot of 17 Horton Street where some words were exchanged between Dehart and a black male. Mr. Roy stated that after the exchange of words, the black

male went into the apartment building and then came running out of it and came toward Roy and Dehart.

Mr. Dehart had been walking away from the apartment and toward Mr. Roy at that point, but turned back to face the black male who was running at him. Mr. Roy then observed that the black male had a gun which he pointed at Dehart. Mr. Roy saw Dehart turn away from the black male and toward him and then was shot in the buttocks area by the black male. Mr. Roy heard Dehart yell out that he had been shot and the two of them ran away to the driveway of 34 Bartlett Street.

Officer O'Malley asked Roy whether Dehart had armed himself with a knife at some point during this confrontation and Roy advised that, while Dehart often carries a knife on his belt, he did not see him armed with a knife during the confrontation.

Officer O'Malley conducted a follow-up interview with Mr. Dehart four days after he had been shot. Mr. Dehart showed Officer O'Malley his gunshot injury, which was in the rear of his left hip. Officer O'Malley had Mr. Dehart recount the events of May 19, 2008, and while doing so, Dehart admitted that as he saw Mr. Phipps approaching him with a gun in his hand, he had pulled a knife out of his coat pocket. Mr. Dehart said that he tried to open the knife but then turned to run away, at which point he was shot. Dehart stated that he did not pull the knife out until he saw the man approaching him with a gun in his hand, which frightened him. While he took the knife out to protect himself, Dehart quickly decided against trying to use it for that purpose. Dehart stated that once Mr. Phipps pointed the gun at him, he turned to leave, but was shot from behind. Mr. Dehart also described to Officer O'Malley the small handgun that Mr. Phipps used to shoot him.

A .22 caliber handgun matching Dehart's description had been recovered from Mr. Phipps's apartment after Officer O'Malley obtained a search warrant. The gun recovered from Mr. Phipps's apartment had four live rounds and one spent round in it. The gun was determined to be the small handgun with which Mr. Phipps shot Mr. Dehart. The shooting scene at 17 Horton Street had been secured by police immediately after the shooting and Officer O'Malley had also observed the folding knife that was found partially open in the parking lot when he visited the scene the day of the shooting. In reviewing the surveillance video, Officer O'Malley was able to confirm much of what Mr. Dehart and Mr. Roy had described of their confrontation with Mr. Phipps. In the video, Mr. Phipps could be seen coming off the porch toward the two men, with something in his hand that Officer O'Malley could not identify on the film. Mr. Dehart could then be seen removing something from his pocket and appearing to flip it open before turning away from Phipps and starting to walk away. Mr. Phipps walked away off camera and his actual act of shooting Mr. Dehart was not captured on film. Mr. Dehart could be seen dropping a can of an energy drink in his hand, which he claimed happened at the moment he was shot, and then running away. The surveillance film confirmed that Mr. Dehart did not pull anything out of his pocket until after Mr. Phipps approached him with something in his right hand. Even after Officer O'Malley had the film enhanced, it did not show conclusively what either of the men actually had in their hands. The surveillance film also supported Mr. Dehart's story that he had turned away from Mr. Phipps and was walking away from him at the time he was shot in the back of his left hip.

Officer O'Malley was the lead detective in this incident and was accompanied and assisted by Detective James Theiss at both the eyewitness interviews and the examination of the scene. Sergeant Randy St. Laurent handcuffed Mr. Phipps and took him into custody at the

scene of the shooting, shortly after it was reported, which was also captured on the surveillance video. Officer Eric Syphers provided cover for Sgt. St. Laurent as he approached Mr. Phipps and stayed with him until Mr. Phipps was taken to the police station. Officer Syphers and Officer Joseph Philippon were assigned the task of securing the scene of the shooting until it could be examined by Officer O'Malley and Detective Theiss when they returned from speaking to the witnesses. Officer Jeremy Somma provided the transport for Mr. Phipps from the shooting scene to the Lewiston police station.

After Mr. Phipps refused to answer any questions at the police station, Phipps was charged with elevated aggravated assault and transported to the Androscoggin County Jail. On June 4, 2008, the Androscoggin County Grand Jury indicted Mr. Phipps on charges of elevated aggravated assault (Count 1), attempted murder (Count 2), and aggravated assault (Count 3). All charges stemmed from Mr. Phipps's use of a firearm to shoot James Dehart. On January 13, 2009, the Androscoggin County District Attorney, by Information, added a charge of reckless conduct as Count 4 of the complaint against Mr. Phipps. The reckless conduct charge also was based on Mr. Phipps's use of a dangerous weapon to injure James Dehart. On the same day the Information was drafted, January 13, 2009, Mr. Phipps entered into a plea bargain whereby he pled guilty to Count 4, reckless conduct, which had been added by Information, and the other charges were dismissed.

When Officer Syphers and Sergeant St. Laurent took Mr. Phipps into custody at the scene, Phipps offered no resistance and was cooperative with them. The only force used against Mr. Phipps was the minimal amount needed to place handcuffs on him for the officers' safety. The officers also had no problems placing Mr. Phipps in Officer Somma's cruiser so that he could be transported the short distance to the police station. At no point during Officer

8

Syphers's entire encounter with Mr. Phipps on May 19, 2008, did Phipps ever complain about the treatment he was receiving by the police officers involved.[3]

All information obtained by Officer O'Malley in his investigation, including Mr. Dehart's initial denial that he had a knife in his possession and his subsequent admission that he had pulled a knife out of his coat pocket as Mr. Phipps approached him with a gun, was provided to the Androscoggin County District Attorney's office. Any decisions regarding possible charges against either Mr. Phipps or Mr. Dehart for their respective roles in the incident were made solely by the Androscoggin County District Attorney and the Grand Jury.

### The May 2, 2010, Incident – O'Malley, Cramp

Officer O'Malley was subsequently involved in another incident with Kenneth Phipps on May 2, 2010. On May 2, 2010, Kevin Cramp held the rank of Corporal with the Lewiston Police Department. On May 2, 2010, Officer O'Malley and Cpl. Cramp were dispatched to the area of St. Peter and Paul Basilica for a report of a blue vehicle being driven recklessly in a parking lot between Bartlett Street and Horton Street. Officer O'Malley did not locate the car on his arrival. Officer O'Malley spoke briefly with Richard Stone, who lived nearby and informed Officer O'Malley that the blue car had turned onto Horton Street and left the area. Upon Cpl. Cramp's arrival, he saw no vehicles in the lot and dispatch advised him that the vehicle involved was on Horton Street at that point. Officer O'Malley advised Cpl. Kevin Cramp by radio that the car had turned onto Horton Street, as Cpl. Cramp was also searching for the vehicle.

---

[3] The defendants also put forth the unedifying conclusory observations: No decisions or actions that Officer Syphers took with regard to Mr. Phipps were motivated in any way by Phipps's race or the race of his shooting victim. At all times, Officer O'Malley acted in good faith with regard to his role in the investigation of the shooting of James Dehart by Kenneth Phipps. No decision Officer O'Malley made or action he took was motivated in any way by the race of either Mr. Dehart or Mr. Phipps.

Officer O'Malley drove down Horton Street and observed Mr. Phipps's vehicle pulled over to the side of the road, flashing its headlights at him. Mr. Phipps then drove over to Officer O'Malley and Officer O'Malley told Phipps to pull his car over so they could speak.

As Corporal Cramp was driving on Horton Street, he came up behind a vehicle that was driving slowly and swerving back and forth. Cramp signaled the vehicle to stop with his blue lights and the vehicle continued turning the wrong way onto Pine Street, a one-way street, before pulling over. Cramp identified the driver by his Maine driver's license as Kenneth Phipps. Mr. Phipps, a black male, told Corporal Cramp that he was trying to escape an attacker who was chasing his vehicle on foot.

Also at that location were a white couple, a man and a woman later identified as Darrin Biegler and Rebecca Blankenship. The officers spoke with Darrin Biegler and Rebecca Blankenship who claimed that Mr. Phipps had attempted to run them over with his vehicle. Mr. Biegler advised the officers that Mr. Phipps was upset because Biegler's girlfriend, Ms. Blankenship, had picked some flowers from the front of Mr. Phipps' residence. Mr. Biegler reported that Mr. Phipps then pulled up in his vehicle and confronted them about the flowers. Mr. Biegler stated that he and Phipps then got into a verbal dispute. Mr. Biegler said he walked away, while Mr. Phipps followed him in his vehicle. Once Biegler reached the church parking lot, Mr. Phipps began revving his engine and lurched forward to strike him with the vehicle. Mr. Biegler said he jumped up on the hood of the vehicle to avoid being injured and then attempted to run away. Mr. Biegler said that Mr. Phipps began chasing him around the parking lot with his vehicle and that he ran down to Horton Street where police eventually arrived. Ms. Blankenship gave the same account as Mr. Biegler's of what had transpired between Mr. Phipps and Mr. Biegler.

Corporal Cramp and Officer O'Malley then spoke with Mr. Phipps. Mr. Phipps said he had arrived home to 17 Horton Street and observed Ms. Blankenship picking flowers he had planted in front of the building and that he was following after them. Some flowers were seen on the side of the roadway. As Cramp continued to interview Mr. Phipps, Officer O'Malley returned to speak with Mr. Stone. Mr. Phipps stated to Cramp that he asked Ms. Blankenship not to pick the flowers and that Mr. Biegler became verbally abusive toward him. Mr. Phipps said that Mr. Biegler then ran to Phipps's vehicle and cracked the windshield by punching it with his fist. Mr. Phipps showed Cramp a small crack on the lower right corner of his windshield that he claimed was caused by Mr. Biegler. Mr. Phipps advised Cramp that Biegler then grabbed him and attempted to pull Phipps from the vehicle, so Phipps drove away to escape him. Mr. Phipps claimed that Biegler chased after him on foot as he tried to get away. Corporal Cramp could not understand why Mr. Phipps, who was in a vehicle, could not escape Mr. Biegler, who was on foot. Mr. Phipps told Cramp that he wanted to keep Biegler in sight so he could be apprehended when the police arrived because he wished to pursue charges against him.

Because the conduct that had been described to Corporal Cramp by both sides would only have supported misdemeanor criminal charges, Cramp could not legally arrest anyone for a misdemeanor crime that he did not witness. Officer O'Malley returned to speak with Mr. Stone who advised that he had heard a crash coming from the area of the parking lot near the church. As Mr. Stone looked out into the parking lot, he observed a male and female walking together, and then observed a blue car racing across the parking lot, heading straight for them. Mr. Stone stated that he thought the car was going to run them over. The blue car then began driving in circles and he wondered what the operator of the vehicle was doing. Mr. Stone observed that the car then sped out of the parking lot as the male subject began chasing after it on

11

foot. Officer O'Malley asked Mr. Stone if he observed the car strike the male or female and Stone stated that he did not. Officer O'Malley also asked Mr. Stone if the male subject had struck the car and Mr. Stone indicated he did not see that either.

While at the scene, a woman named Dee Dee Guerette approached the scene and told Corporal Cramp that she had witnessed the altercation. Ms. Guerette advised Cramp that after Mr. Phipps asked Ms. Blankenship to stop picking the flowers, words were exchanged between Phipps and Biegler, and that Biegler ran over to Mr. Phipps's vehicle and struck it. Ms. Guerette also reported that when Mr. Phipps pulled away in his vehicle, Mr. Biegler began chasing it as Phipps drove into the church parking lot. Ms. Guerette also indicated that Biegler threw one of his shoes at Mr. Phipps's vehicle as he chased him. Ms. Blankenship filled out a witness statement which Officer O'Malley turned over to Cramp, who was handling the investigation of this incident.

Both Mr. Biegler and Ms. Blankenship were given criminal trespass warnings and ordered to have no contact with Mr. Phipps or his residence. Officer O'Malley had no further involvement in the investigation of this May 2, 2010, incident involving Mr. Phipps. Cramp took written statements from Mr. Phipps, Ms. Blankenship, and Ms. Guerette as part of his investigation.

Mr. Phipps advised Corporal Cramp that he had a surveillance camera on the outside of his apartment building and they went to Phipps's apartment to see if any parts of the incident had been captured by the camera. The surveillance video of the May 2, 2010, incident was very dark and Cramp was unable to see any of the actions that Mr. Phipps and the others had described. Because of the conflicting statements, Cramp declined to summons any of the participants at that time and advised them that he would provide all the investigative materials, including their

statements, to the District Attorney for review and possible charges. Cramp subsequently

received correspondence from the District Attorney's office indicating this matter had been

reviewed and that no criminal charges would be approved because of the conflicting versions of

events.[4]

Corporal Cramp provided all information he had obtained, including the three written

statements of the witnesses, to the District Attorney and any charging decisions were left entirely

to the discretion of the District Attorney.

Although Phipps has not responded to the summary judgment statement of facts, he did

submit a number of exhibits in support of his original complaint. Neither the exhibits nor the

allegations in the complaint suggest that these material facts are disputed, except to the extent

that Phipps maintains that O'Malley was motivated by bias toward him as a black man. Phipps's

requested remedy in his lawsuit is payment of his vehicle damages resulting from the May 2

incident, a request apparently conveying his frustration at the decision not to bring criminal

charges in connection with that incident. (Compl. ¶ 8.)

The biggest factual dispute in this suit appears to be around the Deborah Guerette

statement and whether or not O'Malley included her voluntary statement with his investigative

reports. (Compl. ¶ 7.) Nevertheless, according to the defendants' materials, Cramp agrees that

she did provide a written statement at the time and that he did submit her statement to the District

Attorney along with all his investigative materials, so the factual dispute is not really material in

terms of the record evidence before this court on the issue of why no criminal charges were

---

[4]     The defendants include the following factual statements that are not material to my recommendation
because they are assertions of motive or non-motive that, while unopposed, are of little use in the context of granting
judgment on an unopposed motion for summary judgment apropos a pro se plaintiff.

> No action or decision made by Officer O'Malley on the occasion of May 2, 2010, was motivated
> in any way by the race of the persons involved. At all times, Cramp acted in good faith with
> regard to his role in the investigation of the incident involving Mr. Phipps, Mr. Biegler, and Ms.
> Blankenship. No decision Cramp made or other action he took was motivated in any way by the
> race of any of the participants in the event.

brought against Biegler.  (See Cramp Aff., Doc. 17.)  The Guerette witness statement submitted

by Cramp is dated May 2, 2010, and the one filed by Phipps in support of his complaint is dated

September 14, 2010.  (See Doc. No. 1-7, voluntary witness statement.)  The discrepancy is

unexplained, but it appears clear that the record evidence supports the factual assertion that

Cramp forwarded the Guerette statement to the District Attorney's Office along with his other

investigative materials.  It is clear that when the District Attorney's Office conducted its review

on July 12, 2010, it had Guerette's statement in its possession.  (Doc. No. 17-2.)

## Discussion

The premise of Phipps's complaint appears to be that he was the victim of a civil rights

conspiracy by officers of the Lewiston police department, ranging from the chief of police down

to a uniformed officer who drove a cruiser to the scene of one of these incidents.  Phipps places

O'Malley at the center of this conspiracy apparently because O'Malley was the one officer who

appeared at both the May 19, 2008, incident and the May 2, 2010, incident.  Phipps's complaint

does not contain any allegations that O'Malley spoke in a racially biased fashion or did anything

else to overtly demonstrate racial prejudice, but he alleges, in conclusory fashion, that O'Malley

"immediately displayed a bias against Kenneth Phipps."  (Compl. ¶ 2.)  According to Phipps's

complaint, this racial animus led to the criminal charges against him brought in connection with

the May 19, 2008, incident and to the failure to prosecute his assailant in connection with the

May 2, 2010, incident.  Because there is no evidence of a constitutional violation in connection

with either incident and because there is no evidence that O'Malley, or any other officer, acted

out of racial animus, the defendants are entitled to summary judgment.

*The May 19, 2008, Incident*

The defendants are correct that, to the extent Phipps is challenging the legality of his arrest and conviction in connection with the DeHart incident, Napier v. Town of Windham, 187 F.3d 177, 184 (1st Cir. 1999) precludes him from relitigating facts essential to his prior criminal conviction. Thus Phipps's conviction for reckless conduct against Dehart conclusively establishes that O'Malley had probable cause for arrest because it establishes that Phipps recklessly created a substantial risk of serious bodily injury to Dehart with the use of a firearm -- a Class C crime under Maine law-- with respect to which O'Malley could make a probable cause arrest. It is not clear that Phipps is challenging his arrest or conviction directly; rather, he may be referencing the incident as somehow evidence of the racial animus he alleges permeates the Lewiston Police Department. In any event, he neither alleges nor presents evidence of any discrete constitutional violation in connection with the events of May 19, 2008.

### *The May 2, 2010, Incident*

In connection with this incident Phipps seems to be suggesting that O'Malley and company did something to hinder the prosecution of his alleged assailant. The factual record simply does not support the allegation because whatever shortcoming may have been connected to O'Malley's role in the proceeding, it is conclusively established that Cramp presented a complete case file with all witness statements to the District Attorney's Office. The decision regarding prosecution was made by that office, not the Lewiston Police Department. Additionally, as defendants point out, a private citizen does not have a constitutional right to have particular individuals prosecuted for particular crimes, "even when the failure to prosecute was allegedly discriminatory." Parkhurst v. Tabor, 569 F.3d 861, 866 (8th Cir. 2009). The Parkhurst court took care to point out that the failure to prosecute a particular individual is not the same as the failure of the police to provide protection to an individual based on that person's

race.  Id.  Phipps's complaint in this case, "denial of access to the courts," falls squarely into the former category and is not an allegation about failure to provide police protection to certain individuals or neighborhoods because of race.

***The Racial Conspiracy***

Nevertheless, Phipps maintains that these two incidents occurring over a two-year period demonstrate a pattern and practice that is consistent with the policy of the Lewiston Police Department to deny equal protection under the law to members of his race in violation of 42 U.S.C. § 1985.  Section 1985 requires that a plaintiff "allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'"  Burns v. State Police Ass'n of Mass., 230 F.3d 8, 11 (1st Cir. 2000) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) )(internal citation omitted).  The Burns court based its decision on a summary judgment record.  Id. at 12.  The Burns summary judgment record included deposition testimony of a witness that "could be interpreted as racially biased on the part of a few members of [the defendant association.]."  Id.

Phipps has not pled facts necessary to support a conspiracy or developed a summary judgment record with any evidence of racial animus.  Although he alleges that he can demonstrate a pattern on the part of O'Malley, supported by the other defendants, that the code of conduct among the Lewiston police department officers  is "when in doubt arrest the black." (Compl. ¶ 1.)  That is an extremely serious allegation and one which this court does not take lightly, but in fact, Phipps's factual allegations demonstrate no such pattern.  As the result of the first incident he was lawfully arrested for shooting in the back an individual retreating from the confrontation.  In the second incident, Phipps was not arrested, although the circumstances of the

16

incident were, indeed, in doubt. There is no triable issue concerning a civil rights conspiracy or

an equal protection constitutional violation demonstrated within this <u>uncontested</u> summary

judgment record.

## Conclusion

Based upon the foregoing I recommend that the court grant the defendants' motion and

enter summary judgment on behalf of all defendants.

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, within fourteen (14) days of being
served with a copy thereof. A responsive memorandum shall be filed within
fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 22, 2011